STEPHEN H. PAINTER, JR., PLAINTIFF-RESPONDENT, v. JOAN PAINTER, DEFENDANT-APPELLANT.

Reargued January 7, 1974—Decided June 5, 1974.

198

200

*Mr. William F. Tompkins* argued the cause for appellant (*Messrs. Lum, Biunno and Tompkins,* attorneys; *Mr. Tompkins,* of counsel; *Mr. James C. Orr,* on the brief).

*Mr. Monroe Ackerman* argued the cause for respondent (*Messrs. Rudd, Ackerman, Leibowitz and Corradino,* attorneys; *Mr. Thomas A. Portanova,* on the brief).

*Mr. Howard H. Kestin* argued the cause for *Amicus Curiae,* New Jersey State Bar Association.

The opinion of the Court was delivered by

MOUNTAIN, J. The parties to this suit were divorced by judgment entered March 14, 1972 upon the ground, urged in defendant's counterclaim, that they had lived separate and apart for at least 18 or more consecutive months and that there was no reasonable prospect of reconciliation. *N. J. S. A.* 2A:34–2(d).[1] Thereafter, in accordance with the authority contained in *N. J. S. A.* 2A:34–23 — as amended by the 1971 enactment — the trial court made an equitable distribution of the marital property. 118 *N. J. Super.* 332 (Ch. Div. 1972). We granted certification, 62 *N. J.* 192 (1972), as we did simultaneously in several companion cases, in order to consider the questions these cases raise and that are generally presented by this important legislation.

---

[1] This is the so-called "no fault" ground for divorce, introduced for the first time into our law by *L.* 1971, *c.* 212, which became effective September 13, 1971.

Stephen and Joan Painter were married October 17, 1953, and lived together as husband and wife until January 23, 1967. Three children were born of the marriage and at the time of the institution of this suit, in October, 1970, they were 15, 12 and 7 years of age. They have always been, and remain, in the custody of the mother.

At the trial it was determined that the total assets of plaintiff, Stephen Painter, had a value of $230,309 and those of defendant, Joan Painter, a value of $99,709. However, in determining the value of property subject to equitable distribution pursuant to *N. J. S. A.* 2A:34–23, the court excluded assets which were acquired by gift or inheritance during marriage as well as property owned prior to marriage. Pursuant to this formula, the court determined the plaintiff's and defendant's assets available for distribution, as being $82,571 and $58,199, respectively. In addition, plaintiff's income in 1971 was found to have been $32,218.

The court then entered an order directing plaintiff to pay (a) alimony and support in the sum of $12,000 per year, allocated $500 per month as alimony and $166.66 per month as support for each of the three children; (b) all reasonable medical and dental care for the three children and all medical care for the defendant; (c) "twenty per cent (20%) of the difference between plaintiff's and defendant's *available* assets — $4,874." (emphasis added).

The issues presented to the Court on this appeal concern both the constitutionality and the interpretation of *L.* 1971, *c.* 212. The constitutional validity of the statute is challenged upon three grounds. First, it is argued that it embraces more than one object in violation of Art. 4, sec. 7, par. 4 of our State Constitution. Secondly, it is urged that the equitable distribution portion of *N. J. S. A.* 2A:34–23 is void for vagueness. Finally it is claimed that the same equitable distribution clause, unless interpreted as applying prospectively only, will result in a deprivation of property without due process of law in contravention of the Fourteenth

Amendment of the Federal Constitution as well as Art. 1, par. 1 of the New Jersey Constitution. This final point is considered at length and decided in favor of constitutionality in *Rothman v. Rothman,* 65 *N. J.* 219 (1974) decided this day. We will turn to the first two of these constitutional arguments after briefly reviewing the statute under consideration.

Pursuant to *L.* 1967, *c.* 57 (as amended by *L.* 1968, *c.* 170 and *L.* 1969, *c.* 25) the Legislature created a Divorce Law Study Commission ". . . to study and review the statutes and court decisions concerning divorce and nullity of marriage and related matters . . ." *L.* 1967, *c.* 57, 144–145. In the preamble to this enactment it was noted that not since 1907 had there been any general revision of the statutes of the State relating to divorce, nullity of marriage or other phases of the law of domestic relations. Consequently, it went on to point out, except for the Blackwell Act, (*L.* 1923, *c.* 187), which added extreme cruelty as a ground for divorce, there had been no significant legislation during this period pertaining to this general subject matter, although during the same interval concepts of marriage and divorce had been drastically altered.[2] Legislative investigation and study were deemed essential as a necessary prerequisite to the drafting of a law that would adequately respond to the felt needs of our present day society in this area. On May 11, 1970 the Final Report of the Commission was submitted to the Governor and the Legislature. In very large part, but not entirely, the resulting statute, *L.* 1971, *c.* 212, was based upon

---

[2]The evolution of new concepts as to marriage and divorce is the subject of an extensive literature. As examples, see McWalter, "Marriage as Contract: Towards a Functional Redefinition of the Marital Status," 9 *Colum. Jour. of Law and Social Problems* 607 (1973); Kelso, "The Changing Social Setting of Alimony Law," 6 *Law & Contemp. Prob.* 186 (1939); Daggett, "Division of Property Upon Dissolution of Marriage," 6 *Law & Contemp. Prob.* 225 (1939); Johnstone, "Divorce: The Place of the Legal System in Dealing with Marital Discord Cases," 31 *Ore. L. Rev.* 297 (1952).

the proposed Divorce Reform Bill which accompanied and was made part of this Report.

The most significant changes in our matrimonial law that have resulted from the adoption of this act are the following:

1. In addition to the pre-existing statutory causes for divorce, *i. e.,* (1) adultery, (2) desertion and (3) extreme cruelty, the act includes as additional grounds: (4) separation for at least 18 months where there is no reasonable prospect of reconciliation; (5) voluntarily induced addiction to a narcotic drug, or habitual drunkenness, for a period of 12 months; (6) institutionalization because of mental illness for a period of 24 months; (7) imprisonment of the defendant for 18 months, and (8) deviant sexual conduct voluntarily performed by the defendant without the consent of the plaintiff. *N. J. S. A.* 2A:34–2.

2. Obstinacy need no longer be proven in order to establish a cause of action for desertion, which now accrues after twelve months willful and continued desertion rather than after two years as had previously been the case. *Id.*

3. Extreme cruelty, as a ground for divorce, is now defined by statute to include "any physical or mental cruelty which endangers the safety or health of the plaintiff or makes it improper or unreasonable to expect the plaintiff to continue to cohabit with the defendant. . ." *Id.*

4. A plaintiff seeking a divorce on the ground of extreme cruelty may now file a complaint three months after the date of the last act of cruelty complained of, instead of being required to wait six months as was formerly the case. *Id.*

5. Divorce from bed and board, which may be adjudged for the same causes as divorce from the bonds of matrimony, may now be had only upon the consent of both parties. Either party may thereafter at any time apply to have such divorce converted to a divorce from the bonds of matrimony, which application shall be granted as a matter of right. *N. J. S. A.* 2A:34–3.

6. Recrimination, condonation and the clean hands doctrine are no longer available as defenses. *N. J. S. A.* 2A:34–7.

7. If both parties make out grounds for divorce, judgment may run in favor of each. *Id.*

8. The durational residence requirement to initiate an action for divorce, except for adultery as to which there is no such requirement, has been shortened from two years to one year. *N. J. S. A.* 2A:34–10.

9. Issue of an annulled marriage shall be deemed legitimate even if — as was not heretofore the case — the annulled marriage was a non-ceremonial, bigamous union. *N. J. S. A.* 2A:34–20.

10. Alimony may be awarded to either spouse. Except where the judgment for divorce is granted on the no-fault ground of separation, the court may, in awarding alimony, consider the proofs submitted in support of the ground upon which the judgment of divorce is made to rest. *N. J. S. A.* 2A:34–23.

11. Incident to the grant of divorce ". . . the court may make . . . [an] award or awards to the parties, in addition to alimony and maintenance, to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage." *Id.*

An effort has been made, as is apparent from the Commission Report, to move away from the concept of fault on the part of one spouse as having been solely responsible for the marital breakdown, toward a recognition that in all probability each party has in some way and to some extent been to blame. One objective of the Commission was to make it possible to terminate dead marriages regardless of where the responsibility for the failure lay. *Final Report, Divorce Law Study Commission* 6. The Legislature accepted this recommendation and provided, as we have noted above, that separation for at least 18 months where there is no reasonable prospect of reconciliation shall be a ground for divorce. At the same time the Legislature concurred in the Commission's recommendation that fault grounds for divorce be retained,

although somewhat liberalizing the requisites for their availability.

We turn then to the constitutional contentions which have been advanced and consider first the argument that the title of the statute is defective.

Our Constitution contains the following provision:

To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title. [*N. J. Const.* Art. 4, sec. 7, par. 4]

An identical provision appeared as Art. 4, sec. 7, par. 4 of the Constitution of 1844.

The statute we are considering, *L.* 1971, *c.* 212, is entitled thus:

An Act concerning actions for divorce and nullity of marriage, alimony, maintenance and custody of children, and amending N. J. S. 2A:34–1 through 2A:34–3, 2A:34–7 and 2A:34–8, 2A:34–20 and 2A:34–23 and repealing N. J. S. 2A:34–4, 2A:34–5, 2A:34–9, 2A:34–10 and 2A:34–22.

The argument advanced is that because there is no specific reference in the title to "equitable distribution of the property" acquired by the spouses during marriage, therefore at least the portion of *N. J. S. A.* 2A:34–23 dealing with this subject must be stricken. We cannot accept this contention. As has been often noted, the title of a statute is intended to be a label and not an index. *Robson v. Rodriquez,* 26 *N. J.* 517, 527 (1958); *Passaic v. Consolidated Police, etc., Pension Fund Commission,* 18 *N. J.* 137, 145 (1955); *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14, 32 (1953); *Bucino v. Malone,* 12 *N. J.* 330, 342–344 (1953). The constitutional requirement is satisfied when the title gives notice to the Legislature and to the public of the general purpose of the Act and is not in any way misleading. *Public Service Electric, etc., Co. v. Camden,* 118 *N. J. L.* 245, 248–251 (Sup. Ct. 1937); *State v. Guida,* 119 *N. J. L.*

464, 465 (E. & A. 1938). The distribution and allocation of marital assets as between spouses is intimately related to the dissolution of a marriage. There must be very few instances where a divorce is not accompanied by a division of property, either determined consensually or by judicial decree. This close and clear connection is quite sufficient to repel the constitutional attack. *Cf. New Jersey Finance Agency v. McCrane*, 56 *N. J.* 414, 425 (1970). In *Howard Savings Inst. v. Kielb*, 38 *N. J.* 186, 200 (1962) this Court said,

> The purpose of the constitutional requirement sought to be imposed here as a barrier is to prevent frauds flowing from the use of misleading or deceptive titles. If the title is calculated to give to the Legislature notice of the subject to which the act relates and to the public notice of the kind of legislation under consideration and it can be said that the general subject matter is fairly expressed in the title, then there can be no constitutional objection.

As will be discussed at greater length hereafter, the provision concerning the equitable distribution of property was not derived from the proposed Divorce Reform Bill nor from the Report which it accompanied. It did not appear in the bill as originally introduced. Rather it took the form of an amendment adopted during the passage of the bill through the Legislature. The fact of its belated inclusion may perhaps account for the lack of more specific reference in the title.

We have considered a like problem upon at least one earlier occasion. In *State v. Zelinski*, 33 *N. J.* 561 (1960) this Court was required to pass upon the validity of a statute making it an offense to fail to relinquish a telephone party line when requested to do so in an emergency. As orignally introduced the title of the act described it as one concerning crimes, and the offensive conduct was labeled a misdemeanor, which of course is a crime in New Jersey. The Governor, in his conditional veto message, approved the general purpose of the Act, but expressed dissatisfaction with the severity of treatment. The Legislature then amended the

body of the bill to make the proscribed conduct merely a disorderly persons offense, which is not a crime in this State. Inadvertently the title of the statute remained unchanged. We observed,·

It is inconceivable that anyone was misled by the inadvertent failure to amend the title to conform to the substantive changes in the body of the bill. Hence, there is lacking any semblance of the evil to which the constitutional mandate is addressed. [33 *N. J.* at 565–566]

Applying these principles here, we readily conclude that the title of the statute is in no way defective.

The second basis of constitutional challenge is that the section of the act providing for equitable distribution is impermissibly vague and uncertain. The argument here is two-pronged. It is first urged that the term "equitable" is insufficiently precise as a guide to a matrimonial judge in effecting distribution of marital property; secondly, it is contended that there is lacking any sufficient legislative statement as to what property shall be eligible for apportionment between the spouses.

 The doctrine that a statute may be declared invalid because of indefiniteness is well settled, but the rationale upon which it rests has not been very clearly formulated. It has been suggested that there are two important statutory functions which may be significantly affected by indefiniteness. "One of these functions is to guide the adjudication of rights and duties; the other is to guide the individual in planning his own future conduct." Note, "Due Process Requirements of Definiteness in Statutes," 62 *Harv. L. Rev.* 77 (1948). In other words due process requires that the adjudication of a litigant's rights and duties be governed by rules sufficiently clear and objective to guard against an arbitrary result, and that such rules be sufficiently precise to enable a lawyer to advise a client intelligently as to the probable results of a proposed course of conduct.

■ Judged by these criteria the words, "equitable distribution" set forth a standard which is not unduly vague. This phrase simply directs and requires that the matrimonial judge apportion the marital assets in such manner as will be just to the parties concerned, under all of the circumstances of the particular case. That a judge shall do equity is a notion understood by lawyer and litigant alike. It was the realization that certain matters must be disposed of "equitably" that led to the creation and rapid rise in influence of the Court of Chancery in the fifteenth and sixteenth centuries. *Maitland, Equity* (Chaytor & Whittaker ed. 1920) 3–10. The great body of equity jurisprudence that has since developed is a response to the continuing insistence that this need be met.

Nor is it unusual for statutes to employ, without more, words such as "equitable," "fair and equitable," "equitable and just" or phrases of like general import as establishing criteria to govern judicial determination or as describing a prerequisite to judical approval. For instance, borrowing from the earlier law developed in equity receivership reorganizations, *Case v. Los Angeles Lumber Products Co.*, 308 *U. S.* 106, 115, 60 *S. Ct.* 1, 7, 84 *L. Ed.* 110, 119–120 (1939); *Securities and Exchange Commission v. United States Realty & Improvement Co.*, 310 *U. S.* 434, 452, 60 *S. Ct.* 1044, 1051, 84 *L. Ed.* 1293, 1302 (1940), Congress provided in the Bankruptcy Act, 11 *U. S. C. A.* sec. 621, that a plan of corporate reorganization must be "fair and equitable" before it will receive judicial approval by way of confirmation. This statutory requirement has apparently never been challenged; certainly never successfully. Our own Legislature imposed a similar requirement that a plan be "fair and equitable" in a statute providing for the reorganization of building and loan associations. Such a plan, which had received court approval, came under review in *In Re Eleventh Ward B. & L. Ass'n.*, 130 *N. J. Eq.* 414 (E. & A. 1941). A principal argument made by those who

attacked the plan was that the statutory test of "fair and equitable" was impermissibly vague.

It is said that the Legislature has not furnished "definitions or standards for determining 'fairness' and 'equitableness' "; that Chancery "is not limited in its power to do equity," and "the burden is placed squarely upon the conscience of the Chancellor"; that resort to the common usage of these statutory terms is merely "the substitution of one abstraction for another," and "leads nowhere"; that "what is fair and what is equitable will vary with innumerable circumstances." [130 *N. J. Eq.* at 418]

Despite these arguments the court had no difficulty in sustaining the validity of the statute and of the plan. Other general phrases no more precise have readily withstood constitutional attack on grounds of vagueness. *United States v. National Dairy Products Corp.*, 372 *U. S.* 29, 83 *S. Ct.* 594, 9 *L. Ed.* 2d 561 (1963) ("unreasonably low prices") ; *Bandini Petroleum Co. v. Superior Court*, 284 *U. S.* 8, 52 *S. Ct.* 103, 76 *L. Ed.* 136 (1931) ("unreasonable waste").

Today in the laws of many other states, in words very similar to those found in our statute, provision is made for the fair and equitable distribution of marital assets in the event of divorce. For example, see *Alaska Code Ann.*, sec. 09.55.210(6) ("in the manner as may be just, and without regard as to which of the parties is the owner of the property") ; *Colo. Rev. Stat. Ann.*, sec. 46–1–5(2) ("in such proportions as may be fair and equitable") ; 13 *Del. Code Ann.*, sec. 1531 ("such share as the court deems reasonable") ; *Hawaii Rev. Stat.*, sec. 580–47 ("as shall appear just and equitable") ; *Iowa Code,* sec. 598.21 ("as shall be justified") ; *Mich. Stat. Ann.*, sec. 25.99, M. C. L. A. § 552.19 ("as it shall deem just and reasonable") ; *Minn. Stat. Ann.*, sec. 518.58 ("as shall appear just and equitable") ; *N. H. Rev. Stat. Ann.*, sec. 458:19 ("as may be deemed just") ; *N. D. Rev. Code,* sec. 14–05–24 ("as may seem just and proper") ; *Ore. Rev. Stat.*, sec. 107.05(e) ("as may be just and proper in the circumstances") ; *Utah Code Ann.*, sec. 30–3–5 ("as may be [just and] equitable") ; *Vt. Stat. Ann.*,

*Title* 15, sec. 751 ("as shall appear just and equitable"). Counsel have cited no case, nor have we found any, in which legislation of this sort has been successfully attacked as affording insufficient guidelines to the judge charged with the responsibility of allocating marital assets upon the dissolution of a marriage. As Justice Peters observed in *Addison v. Addison*, 62 *Cal.* 2d 558, 43 *Cal. Rptr.* 97, 399 *P.* 2d 897 (1965),

. . . many common-law jurisdictions have provided for the division of the separate property of the respective spouses in a manner which is "just and reasonable" and none of these statutes have been overturned on a constitutional basis.

We hold that the statute before us is free from any constitutional insufficiency upon this score.

　　　　　It seems appropriate at this point to suggest some of the criteria which may properly be taken into account by a matrimonial judge in determining in a given case how the distribution may most fairly be made. In his opinion in the trial court Judge Consodine, after examining authorities in other jurisdictions, compiled a list of such factors, which we here quote with approval.

Guideline criteria over the broad spectrum of litigation in this area include: (1) respective age, background and earning ability of the parties; (2) duration of the marriage; (3) the standard of living of the parties during the marriage; (4) what money or property each brought into the marriage; (5) the present income of the parties; (6) the property acquired during the marriage by either or both parties; (7) the source of acquisition; (8) the current value and income producing capacity of the property; (9) the debts and liabilities of the parties to the marriage; (10) the present mental and physical health of the parties; (11) the probability of continuing present employment at present earnings or better in the future; (12) effect of distribution of assets on the ability to pay alimony and support, and (13) gifts from one spouse to the other during marriage. [118 *N. J. Super.* at 335]

Section 307 of the Uniform Marriage and Divorce Act, which has quite recently been approved by the House of Delegates

of the American Bar Association,[3] contains the following list of criteria:

(1) contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker;
(2) value of the property set apart to each spouse;
(3) duration of the marriage; and
(4) economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children.

See also *Lacey v. Lacey,* 45 *Wis.* 2d 378, 173 *N. W.* 2d 142, 145 (1970) and *Kassebaum v. Kassebaum,* 178 *Neb.* 812, 135 *N. W.* 2d 704, 707 (1965). These factors are obviously intended to be illustrative and not exhaustive. The trial judge must in each case regard all of the particular circumstances of the individuals before the court, and having weighed and evaluated them reach a determination as to how best to fulfill the mandate of the statute. As is made clear in *Chalmers v. Chalmers,* 65 *N. J.* 186 (1974), decided this day, fault of a marital nature is not an appropriate criterion for consideration in effecting an equitable distribution of marital assets. The judicial task may upon occasion be a difficult one but it will hardly be novel. Seeking just and equitable results is and has always been inherent in the judicial function; it has been a chief concern of the courts for many centuries.

 Many if not most property arrangements incident to divorce will probably be agreed upon between the parties, thus obviating the need for judicial intervention. Where, however, the court is called upon to exercise its powers, either in reviewing a proposed settlement when asked to give its approval, or in effecting the allocation itself, it will not be improper for a judge to give appropriate heed to legitimate tax considerations, nor to view sympathetically a resort to the

[3]Approval was given at the midyear meeting held February 4 and 5, 1974. 60 *A. B. A. J.* 446, 451 (April, 1974).

trust device, with its great flexibility, where the most equitable disposition of property interests can thereby be best attained.

It is finally contended that the enactment must fall because there is a fatal lack of specificity as to what property shall be eligible for equitable distribution. It will be recalled that the statute authorizes "[an] award or awards to the parties, in addition to alimony and maintenance, to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage." *N. J. S. A.* 2A:34–23. The general purpose of the legislation is clear. The courts are now empowered to allocate marital assets between the spouses, regardless of ownership. This was not the case before the enactment of the statute. In *Calame, v. Calame,* 25 *N. J. Eq.* 548 (E. & A. 1874) Chief Justice Beasley, writing for a unanimous court, held that the statute permitting the payment of alimony and maintenance to a wife, incident to the grant of a divorce, could not be read to permit the assignment to her of a portion of the husband's real estate in fee or of a sum of money in gross. It was held that the statute comprehended only the grant of power "to give the wife an allowance of money in periodical installments." 25 *N. J. Eq.* at 549. There was, however, no suggestion in the opinion that the Legislature might not, if it saw fit, authorize the allocation of a husband's property by way of provision for a wife who had successfully sought a divorce. The Legislature simply had not chosen to do so. This rule, limiting the court's power to dispose of marital assets, continued unchanged until the passage of the present statute. *Parmly v. Parmly,* 125 *N. J. Eq.* 545 (E. & A. 1939). While the grant of power in the present enactment is expressed in rather comprehensive and general terms, this will not, in itself, in any way derogate from its constitutional validity if judicial interpretation, rendered on a case by case basis if need be,

can supply specific guidelines to govern particular situations. This, we conclude, can readily be done.

Clearly any property owned by a husband or wife at the time of marriage will remain the separate property of such spouse and in the event of divorce will not qualify as an asset eligible for distribution. As to this the statute is explicit. We also hold that if such property, owned at the time of the marriage, later increases in value, such increment enjoys a like immunity.[4] Furthermore the income or other usufruct derived from such property, as well as any asset for which the original property may be exchanged or into which it, or the proceeds of its sale, may be traceable shall similarly be considered the separate property of the particular spouse. The burden of establishing such immunity as to any particular asset will rest upon the spouse who asserts it. In reaching these latter conclusions we admittedly pass beyond the words of the statute. These determinations are, we conceive, those most consonant with presumed legislative intent.

A further question is presented when we consider assets that have come into the ownership of a spouse, or of both spouses jointly, during coverture. To the extent that such property is attributable to the expenditure of effort by either spouse, it clearly qualifies for distribution. Here we have principally in mind the earnings of husband or wife; such assets are certainly comprehended by the statute. But what of property secured by gift, bequest, devise, descent, or in some other way? The trial court found that such property was not available for distribution. We reach a contrary conclusion essentially for the reasons given below.

In the first place we read the statute on its face to express an intent to include such property as eligible for distribution. In the second place, we believe that the exclusion of such

---

[4]The immunity of incremental value to which we refer is not necessarily intended to include elements of value contributed by the other spouse, nor those for which husband and wife are jointly responsible.

assets would result in importing into our law of property, to a significant extent at least, doctrines of community property law. We discern no intent on the part of the Legislature to do this, and we do not think that such a result, with all that it might portend, should be allowed to come about indirectly or without due deliberation.

 The court is authorized to distribute equitably ". . . the property, both real and personal, which was legally and beneficially *acquired* by them [the spouses] or either of them during the marriage." [Emphasis added]. It will be seen that "acquired" is the key word. The trial court accepted a definition to be found in *Webster's Third New International Dictionary* (1965) that the word "acquired" means "attained by the individual by his own efforts." We think the Legislature used the word in a more comprehensive sense to include not only property title to which is the direct or indirect result of an expenditure of effort on the part of a spouse, but also, assets title to which is received by gift or inheritance, or indeed in any other way. Had the former, more restricted meaning been intended, we believe that some confining language would have been employed to manifest this purpose. It is certainly a commonplace to say that property has been acquired by gift or that an asset has been acquired by inheritance. In fact the thought is probably most often expressed in this fashion. We think the word should be given this more inclusive meaning in the statute, absent any indication to the contrary.

We are further moved to place this construction upon the statutory language because of a result which would apparently ensue were we to exclude from eligibility for distribution all property a spouse receives, by bequest or gift, during marriage. Were we to adopt such an interpretation the resulting rule would be that property received by gift or inheritance during marriage, as well as that owned before marriage, would be ineligible for distribution, while presumably all other property would be eligible. Compare this with the

rule followed in community property states to determine whether an asset is separate or community property.

> The statutes of the eight community property states provide that all property acquired by a husband or a wife during their marriage is community property, except for what either spouse acquires by gift, descent, or devise. All property thus acquired, plus that owned before the marriage, is separate property. [4A *Powell on Real Property*, sec. 626, p. 717]

It is true that the rules, otherwise identical, would be used to determine different things. Our rule would decide eligibility for allocation of property between spouses upon the occasion of a divorce,[5] the other to determine whether a particular asset is separate or community property. But the probable influence and effect of the latter upon the subsequent development of the former seems plain.

We do not wish to be taken as suggesting that there is anything wrong with adopting a rule of community property law.

> Much may be said for the community property theory that the accumulations of property during marriage are as much the product of the activities of the wife as those of the titular breadwinner. [Douglas, J., dissenting in *Fernandez v. Wiener*, 326 *U. S.* 340, 365, 66 *S. Ct.* 178, 190, 90 *L. Ed.* 116, 136 (1945)]

The statute we are considering, providing as it does for a fair allocation of marital assets upon divorce, is to some extent at least a recognition of this point of view. But it nevertheless remains true that community property law is very different from our law of property. Its genius is not that of the common law. Its adoption should not occur unwittingly, but only after study and deliberation. The stat-

---

[5] It is important to bear in mind that nothing in our statute effects any change with respect to the ownership of property as between husband and wife prior to the entry of a judgment of allocation. Prior to that event neither spouse, by virtue of this statute, acquires any interest in the property of the other.

utory provision permitting equitable distribution, as has been pointed out, was added to the bill during its passage through the Legislature. No legislative history with respect to this provision exists. We have no reason to suppose that the lawmakers intended to adopt a rule the development and evolution of which would very likely come to be governed by rules of community property law, or that they were aware they might be doing so. Thus we think it preferable to accept the statute literally as written, giving to the word "acquired" the more comprehensive meaning as set forth above.

We therefore hold the legislative intent to be that *all* property, regardless of its source, in which a spouse acquires an interest during the marriage shall be eligible for distribution in the event of divorce.

Finally we think it necessary to consider and determine exactly what span of time is intended by the words, "during the marriage." While apparently clear on its face, the phrase may, in its application, present difficulties. Obviously the period commences as soon as the marriage ceremony has taken place. But when, for the purposes of this statute, does it end? Reading the act literally, the terminal point would seem to be the day the judgment of divorce is granted. Such an interpretation, however, presents practical obstacles. If that date were to be adopted a bifurcated trial would be required in most cases. It would normally not be practicable to introduce at the trial, evidence as to the value of assets determined as of that day. Such a rule, resulting in duplicitous hearings, should be avoided if possible. Conversely, it might be argued that for equitable reasons or for some conceived purpose of public policy no assets should be included that were acquired after it could be shown that there was an irretrievable breakdown of the marriage or after a cause of action for divorce had arisen. But such a rule would be unworkable. How is one to establish with any reasonable precision when a breakdown of the marital relationship has become irretrievable, or, in many cases at least, when a cause of action for divorce first arises?

█ We think the better rule to be that for purposes of determining what property will be eligible for distribution the period of acquisition should be deemed to terminate the day the complaint is filed.[6] In adopting this interpretation of the statute, we also have in mind the probable necessity in many cases of providing a period for discovery both as to the available marital assets of the other spouse, as well as to their value.[7]

The only portions of the judgment below that are before us on this appeal relate to the disposition of property. The cause is remanded for the reconsideration of this issue in the light of what has been said above in this opinion. Because of the interrelationship of property distribution and the award of alimony and maintenance, the provision of the judgment touching upon the latter will also be considered reopened for such review, if any, as the trial court may deem appropriate.

*For remandment*—Chief Justice HUGHES, and Justices HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—6.

*Opposed*—None.

---

[6]Needless to say any disposition of property in fraud of the other spouse could be promptly made the subject of appropriate judicial action. Since the issue is not raised in this case, we do not elaborate upon it further at this time.

[7]We are under no illusion that what we have said above will provide certain and ready answers to all questions which may arise as to whether particular property is eligible for distribution. We have sought only to implement the legislative intent, as we discern it, by setting forth what we believe should be the general governing rules. Individual problems must be solved, as they arise, within the context of particular cases.