## Romeo v. Romeo

*Frank N. Gallagher,* for plaintiff.
*William F. Schroeder,* for defendant.

KELTON, *J.,* June 8, 1983.—In these equitable distribution proceedings under the Divorce Code, Act of 1980, April 2, P.L. 63, No. 26, 23 P.S. §§101 et seq., the principal issue is whether 46,600 shares of SEI Corporation stock now registered in the name of Carmelo V. Romeo (the husband) and having a current market value in excess of $1,300,000 are or are not "marital property" and therefore subject to an order of this court which disposes of ". . . existing property rights and interests" as those terms are used in §401 of the Code. A necessarily interrelated question which cannot be decided until after that question is resolved is how much, if any, permanent alimony should be awarded to Jeanne F. Romeo (the wife) under §401 of the code.

We hold that the shares are marital property and deny permanent alimony.

After hearing before the undersigned and receipt of memoranda and proposed alternative distribution

orders from counsel we make the following findings:

## "MARITAL PROPERTY" STATUS OF SEI CORPORATION STOCK

Under §102(b) of the code, we are required to consider the purposes of the act under §102 (a) to determine the legislative intent. That subsection states that "protection and preservation of the family is of paramount public concern;" that the "realities of matrimonial experience" should be considered; that primary consideration should be given to the "welfare of the family rather than the vindication of private rights;" that the policy of the Commonwealth is to mitigate the harm to the spouses and their children caused by the dissolution of the marriage; and finally that we should "[e]ffectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights."

Section 401(d) requires that we shall ". . . equitably divide, distribute or assign the marital property between the parties without regard to marital misconduct in such proportions as the court deems just after considering all relevant factors . . ." including ten which are specifically enumerated.

Under §401(e) " 'marital property' means all property acquired by either party during the marriage except [inter alia] . . . (4) Property acquired after separation until the date of divorce. . . ."

Section 401 (f) provides that:

(f) All property, whether real or personal, acquired by either party during the marriage is presumed to be marital property regardless of whether

title is held individually or by the parties in some form of co-ownership such as joint tenancy, tenancy in common or tenancy by the entirety. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (e).

The term "acquired" is not defined in the code. History of the husband's stock purchase: The husband was formerly employed as a senior auditor by Arthur Andersen & Co. a national accounting firm. One of his job responsibilities at that firm included auditing and financial work at SEI Corporation of Swedesford Road, Wayne, Pennsylvania (SEI). In November 1976 he resigned from Andersen and in March 1977, at the request of Alfred P. West, Jr., the Board Chairman of SEI and with the concurrence of the other principal officer, Steven M. Katz, husband was employed as the Director of Finance, the principal financial executive at SEI at a base salary of $30,000 per year plus bonuses. Katz and West each owned 50 percent of the voting shares at that time.

Husband's motivation for leaving Andersen and joining SEI was that he was advised by the SEI management that he would have the opportunity to acquire an "equity position" in the company. At the time of his hiring, West advised husband that if he worked out to be a key employee at SEI he would be put on an employees' stock option plan and husband advised wife that he had an agreement to purchase 10,000 shares of SEI stock. He also discussed a proposed stock purchase with his mother-in-law Jean Giordano and told her at dinner in early 1978 that he "had received 10,000 shares of SEI stock." In March 1978 he advised wife that he was getting the stock.

None of the stock was actually issued to husband in 1978, but West, called by the husband as a witness, conceded that if West had been in control of the company in 1978, husband would have gotten his stock then.

Husband and wife separated in October of 1978 when husband left the formal marital residence. There has been no reconciliation since that time.

The actual formalization of the stock purchase agreement was delayed until July 23, 1979 by a disagreement between West and Katz over control of SEI. This dispute commenced in January 1978. In May of that year, Katz told West that he wanted to sell the business, West disagreed, and as a result of litigation between the two, an interim executive officer, Drew Lewis was appointed in about September 1978.

In the fall of 1978, negotiations were commenced to sell all or part of the company to the Sprout Investors at DLJ Capital Corporation of New York. After a temporary impasse in early 1979, Katz finally agreed to sell his 50 percent interest to the outside investors. At that time West identified to the Sprout Investors his five key employees who were to have non-voting stock issued to them at $.05 per share. Of these five, husband was to get 10,000 shares, another employee also was to get 10,000 shares and lesser amounts were to go to the other three. In May and June 1979, husband was made Vice President of SEI and was elected to the Board of Directors.

The formal employee stock purchase agreement of July 23, 1979 which implemented the detailed Sprout 50 percent purchase agreement of May 25, 1979 recited in its preamble, inter alia, that husband ". . . *has rendered* valuable services to and on behalf of the Company, and the Company deems it desirable to retain his services as an employee . . ."

(Emphasis added.) Ten thousand non-voting shares were issued to him on July 23, 1979 at the par value price of $.05 per share and the employer, SEI paid husband's additional U.S. income tax liability of $37,025 resulting from the issuance of shares at less than the market price. There have been stock splits of 2.3 shares for 1 and 2 for 1 since July 1979 and husband's original 10,000 shares now total 46,000. On the date of divorce filing and separation, the value of the shares was unknown; in July 1979, the *husband* valued them for tax purposes at $42,000; when the husband's inventory was filed in June 1982, he valued them at $547,000 and at this time they are sold over the counter at about $28 per share or for a total value of $1,304,800. Clearly depending on whether or not we rule this stock to be "marital property," either both or only one of the parties will experience a considerable enhancement of station in life, estate, capital assets, property and economic circumstances, all of which are relevant equitable distribution factors under §401(d).

All of the foregoing 46,600 shares are currently legally available for sale on the over-the-counter market free of any Securities and Exchange Act restrictions.

Husband also owns 9,720 additional SEI shares issued to him in February 1981. At the current per share price of $28, these shares would have a value of $272,160. 70 percent of these shares are not subject to any sale restrictions and 25 percent are restricted. Husband also has the option to purchase 875 more shares for $3,500, which is about $21,000 below actual value.

We hereby find that the 46,600 SEI shares representing the initially promised 10,000 shares are increased to reflect the stock splits are marital property.

First, as to the initial 10,000 shares issued on July 23, 1979, we find that they would have been issued a year earlier except for the disagreement between Katz and West, the two principal shareholders. Also, we credit the testimony of wife and her mother that husband stated in 1977 and 1978 before the separation that he either had an agreement for or had received 10,000 shares of SEI.

There are no Pennsylvania appellate cases which resolve this precise issue. We do believe, however, that in determining the property status of benefits such as pensions, deferred compensation agreements, profit sharing arrangements, stock options, use of company automobiles and other employee benefits, we should not attempt to interpret §401 in such a manner that we give slavish adherence to old common law principles such as "passage of title" or whether an interest is "vested" as opposed to "contingent" or is merely an "expectancy." Such labels in equitable distribution cases merely announce the court's results. They do not explain how the result was reached. Instead, we believe that in following the purposes of the act in §102 to protect and preserve the family as a "paramount public concern," we should give broad scope to the words "property" and "acquired" under §401. Such an interpretation is consistent with other Pennsylvania decisions. See e.g., Reese v. Reese, 109 Montgomery Co. L. Rep. 290 (1981) non-contributory inchoate Phila. Elec. Co. pension; Kalinoski v. Kalinoski, 9 Family Law Reporter 3033 (Butler Co. 12/1/82, Brydon, J.) non-vested pension rights; Millili v. Millili, 24 D.&C.3d 479 (1982, Davenport, J.) increased income potential from medical degree secured with wife's assistance; Bacchetta v. Bacchetta, 498 Pa. 227, 445 A.2d 1194 (1982) property acquired before the ef-

fective date of the Code; Platek v. Platek, _____ Pa. Super. _____, 454 A.2d 1059 (1982) tort claim proceeds of settlement for injury caused to one spouse during marriage; and Krenzelak v. Krenzelak, _____ Pa. Super. _____, 453 A.2d 998 (1982) property fraudulently conveyed by spouse to child after separation but before Divorce Code. In many other jurisdictions having somewhat similar Divorce Code provisions for equitable distributions, broad interpretations are being given to statutory language relating to the acquiring of marital property. See e.g. Painter v. Painter, 65 N.J. 196, 320 A.2d 484, 494 (1974) giving comprehensive effect to the term "acquired;" Marriage of Clapperton, 58 Or. App. 577, 649 P.2d 620, 622 (1982) holding as marital property stock paid for after separation under an agreement between a company and its controller entered into before separation; Reed v. Reed, (N.Y. Sup. Ct. App. Div. 3,3/31/83), 3 Equitable Distribution Reporter 111, non-contributory teacher's pension two years short of vesting held to be marital; and Matter of Fairchild, 110 Ill. App. 3d 470, 66 Ill. Dec. 131, 442 N.E.2d 557 (1982) holding that both vested and non-vested portions of employee pension benefits were marital property.

In brief summary, in the instant case, the husband left an apparently secure position with a national accounting firm to engage in a riskier business where he had the opportunity to secure an equity position as promised orally at the date of hire. The fact that the implementation of this promise by written agreement was delayed by a disagreement between the two principal owners should not defeat the wife's right to have the shares determined to be marital. We believe a contrary holding would encourage spouses who were about to receive an em-

ployment windfall to separate from their families before the benefit was received, a result expressly contrary to the family preservation goals announced in §102 of the Code.

As to the increase in the number of shares from the two later stock splits, they should be treated as marital property also. True stock splits and exchanges of stock are treated as a restructuring of the original principal for fiduciary accounting purposes under the Probate, Estates and Fiduciaries Code, 20 Pa. C.S. §8105 (a) and (b) and we see no reason to apply a different principle here. Hence all 46,600 shares are marital property.

As to the later stock purchases and options granted after the separation, the wife properly concedes that they are the husband's separate property.

## FACTORS RELEVANT TO A DISTRIBUTION ORDER UNDER SECTIONS 401(d) OF THE CODE

The parties have been married for 13 and one-half years, since January 11, 1970, and had no prior marriages. As to age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties, the husband, Carmelo v. Romeo is 39 years old and was born on December 30, 1943. He currently resides in a town house in Paoli, Pa., which he purchased under a lease purchase arrangement originally entered into in May 1981 after he parties' separation. It has a present value of approximately $134,000 and is subject to a mortgage balance of $100,000. He owns furniture at his residence valued at $8,000, owns a few shares of stock, a tax free

bond of $10,000 and $15,000 in a T.Rowe Price money market fund plus the use of a company owned Mercedes automobile valued at $35,000 on which there is an outstanding loan of $17,000.

His annual salaries have been as follows:

| | |
|---|---|
| 1977 | $35,072. |
| 1978 | 44,750. |
| 1979 | 48,750. |
| 1980 | 109,775. |

His present salary is about $85,000 per annum not including bonuses or profit sharing distributions. He has sold the 1977 Buick LeSabre which he owned at the time of separation. His SEI stock holdings and options are noted above.

Defendant wife, Jeanne F. Romeo, is 38 years of age, was born on March 21, 1945, resides in the parties' entireties residence at Douglas Drive, Huntington Valley, Bucks County, with their two sons, age 12 and 10. The house has a fair market value of $85,000 and is subject to a mortgage with a present balance of $20,000. She is a high school graduate with two years of nursing school and was employed as an electroencephalographic technician prior to the birth of the first child. She has not been employed since.

The wife has had seven operations for cancers in her shoulder and presently has limited use of her deltoid and trapezius muscles. The cancer is presently in remission. She is in possession of the jointly owned 1978 Buick LeSabre, household furniture of about $9,000 a portion of which was given by her parents, is keeping the house and raising the children who visit husband every two weeks. Husband is currently paying $200 per week plus mortgage

service payments for spouse support plus $115 per week plus medical expenses and summer camp costs for the children all under a Montgomery County support order.

The record does not reflect any significant contribution of either spouse to the education and earning power of the other. The husband has excellent opportunities to acquire future assets and income, but we also note that the SEI stock may be subject to wide fluctuations in market value. SEI Corporation has computer software installations in the trust departments of over 400 banks throughout the United States, but the business is obviously operating in an area in which it could be subject to technological obsolescence.

Each party has contributed to the acquisition of the marital property, the wife as homemaker and the husband in the business. Their standard of living is high and their economic circumstances are promising.

Because it is impossible to place a constant asset value on the portion of the SEI stock which we have held to be marital property, we believe that it is proper to allocate that asset between the parties on a percentage of total shares basis rather than attempt to fix a single value on that asset. In that way, both husband and wife will each share in the rewards and risks of any significant future price changes.

Considering all of the §401(d) distribution factors discussed above, we believe that a fair distribution order should allocate 60 percent of the 46,600 shares to the husband and 40 percent to the wife, should distribute the marital domicile and furniture therein to the wife, one car to each and the remain-

der interest in the Willow Grove property to the husband. This results in the following:

## PROPERTY SUMMARY AND DISTRIBUTIONS SCHEDULE

### I. MARITAL PROPERTY

|  | To Husband | To Wife |
|---|---|---|
| SEI STOCK | 27,960 shares (60%) | 18,640 shares (40%) |
| Remainder interest, Willow Grove Property | $12,500. | — |
| Huntington Valley House (net) | — | $65,000. |
| Car | 2,000. (disposed of) | 2,000. |
| Furniture | — | 9,000. |

### II. NON-MARITAL PROPERTY

The husband shall retain as his separate property any remaining stock or options to purchase the same other than the 46,600 shares distributed above, plus his Paoli town house, company profit sharing plan, Paoli furniture, Mercedes Benz, individual checking account and municipal bond.

The wife shall retain her Morgan Growth Fund, any remaining furniture and personal and household effects at the Huntington Valley house and her individual checking account. Each party shall retain any other property currently in his or her possession and not specifically discussed in this opinion.

### PERMANENT ALIMONY

Under §501(a) of the Code, and only because of our finding as to the inclusion of the SEI stock as marital property, and the distribution of a portion thereof to the wife, we find that she will not lack sufficient property to provide for her needs. We find that because of her home responsibilities and phys-

ical condition, she is currently unable to support herself through appropriate employment.

We therefore deny her request for permanent alimony.

## COUNSEL FEES

We find that the wife's request for counsel fees and costs in the amount of $5,996.74 is reasonable under the circumstances and therefore allow that amount for her counsel's services to date. Husband shall pay that amount to wife or to wife's counsel.

## DIVORCE

Both parties agree that grounds for no-fault divorce exist and a final decree in divorce will be entered at this time.

We therefore enter the following

## FINAL DIVORCE DECREE

And now, June 8, 1983, Carmelo V. Romeo, plaintiff, and Jeanne F. Romeo, defendant, be and they are hereby divorced from the bonds of matrimony and all of the duties, rights and claims accruing to either of the said parties at any time heretofore, in pursuance of said marriage shall henceforth cease and determine, and said parties shall severally be at liberty to marry again, in like manner as if they never had been married.

## NISI ORDER FOR EQUITABLE DISTRIBUTION AND COUNSEL FEES

And now, June 8, 1983, the court hereby enters a nisi order of equitable distribution and for counsel fees in accordance with the foregoing opinion and distribution schedule. Each party shall perform all acts and execute all documents necessary to carry this order into effect.

Each party shall have the right to file exceptions to the court's findings, conclusion and this nisi order within ten days hereof with additional proceedings if any related to this nisi order to be substantially in accordance with the procedures set forth in Pa. R.C.P. 1518 and 1519.

## MEMORANDUM AND FINAL DECREE

KELTON, *J.,* December 23, 1983.—Both husband and wife have filed exceptions to our opinion, findings and nisi order * awarding counsel fees to the wife and equitable distribution of marital property.

Upon review of the matter and after brief and argument before a court en banc, we dismiss all of the exceptions and will enter the decree nisi as a final decree.

Our earlier opinion did not state clearly our intention that the wife was to assume the responsibility of the mortgage payments on the marital dwelling being distributed to her. Husband requests that we clarify that question and we hereby affirm that our order was intended to require the mortgage assumption by the wife when the remaining distributions are effectuated.

Only one other matter requires comment in addition to the matters previously discussed. Husband argues that this court should give consideration to the federal and state tax implications of our distribution order contending that he will definitely have to pay a capital gain tax on the "transfer" of the 40 percent interest in the SEI Corporation stock to the wife. His argument is that under U. S. v. Davis, 370 U. S. 65, rehearing den. 371 U. S. 854, arising under Delaware law, a taxable gain would be recog-

---

* 42 Bucks Co. L. Rep. 112 (1983)

nized and that the husband would be liable for tax on a realized gain. We can find no clear authority, however, that would lead us to conclude that an equitable distribution under the Pennsylvania Divorce Code necessarily requires a conclusion that a sale or exchange for tax purposes has actually taken place.

In our judgment, earlier decisions holding that transfer of appreciated stock from one spouse to another in divorce settlements are taxable (see e.g., Wiles v. Commissioner, 499 F. 2d 255 (C.A. 10, cert. den. 419 U. S. 996 (Kansas law)) do not necessarily require a similar holding under equitable distribution statutes. Compare Imel v. U. S., 523 F. 2d 853 (C.A. 10 1975) (Colorado law) and Rev. Rul. 81-292, 1981 — 2 CB 158 (holding that an approximately equal division of jointly owned property in a non-community property state is a nontaxable event).

Thus, although we believe that it would be entirely appropriate for us to consider any serious tax consequences of our equitable distribution decision, we are unable to do so here. We believe that the tax law is not sufficiently clear to permit us to predict the consequences with certainty. Contrary to the husband's contention, we believe that it is equally arguable that the federal and state tax authorities might well conclude as we already have that what the husband and wife are being required to divide between them as a result of the marriage break-up is something which they both already owned as marital property. Our order merely confirmed the wife's previous ownership. Hence, we will not disturb our previous order.

## FINAL ORDER

And now, December 28, 1983, plaintiff's and defendant's exceptions to the trial judge's opinion and

nisi order for equitable distribution and counsel fees are each respectively dismissed, the findings contained therein are confirmed and the said nisi order is hereby entered as the final order of the court and judgment is entered thereon.