**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0700-17T3

EDWARD FOX, III,

    Plaintiff-Appellant,

v.

CATHERINE FOX,

    Defendant-Respondent.

_____

Argued November 14, 2018 – Decided April 9, 2019

Before Judges Ostrer and Currier.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-0355-16.

Robert J. Wittmann argued the cause for appellant.

Michael J. Confusione argued the cause for respondent (Hegge & Confusione, LLC, attorneys; Michael J. Confusione, of counsel and on the brief).

PER CURIAM

Plaintiff, Edward Fox III, appeals from the trial court's equitable distribution of his bowling equipment company, EBN Services, Inc. (EBN). After trial, the court split the value of the company equally between Edward and his former spouse, Catherine Fox.

Edward presents three arguments on appeal. He contends that EBN should not have been subject to equitable distribution because Catherine did not contribute to the company's growth during or after the marriage. Second, he argues if EBN is subject to equitable distribution, then it should have been distributed according to its value in 2012, the date of separation, instead of 2015, when Edward filed for divorce. Last, Edward contends that the trial court abused its discretion by distributing the business equally.

After reviewing the facts and underlying legal principles, we remand for a determination of the company's pre-marital value. Edward started his company in 2001, about three years before the couple married in 2004. The trial court assumed that EBN did not have a positive value in 2004 because it was not profitable at the time. The court therefore subjected EBN's full 2015 value to distribution. On remand, Edward will have an opportunity to refute the trial court's assumption. We otherwise affirm.

A-0700-17T3

I.

We discern the following facts from the record. Edward and Catherine first met and moved in together in 1996. Shortly after, the two had their first child together, E.F., who has autism. The couple had a second child, A.F., in 1999. Edward and Catherine each brought a son from a previous partner into the relationship – D.E. and C.P. The relationship broke down in late 1999 and the couple split up for the first time.

During the separation, Edward worked as a bowling alley mechanic, but he also started his own small business, EBN, in 2001. The company mostly acquired and resold used bowling equipment. Edward ran EBN out of his apartment as a part-time endeavor. Between 2001 and 2004, the business did not turn a profit. In 2004, the business had a net loss of roughly $13,000 on gross receipts of over $208,000, according to Edward's tax return.

Edward and Catherine moved back together in 2003 and married in July 2004. During the marriage, Catherine and Edward shared the household work. Edward testified that he did most of the grocery shopping and transported the kids to and from school four days a week. He admitted that Catherine did the laundry and most of the other shopping. He said that he and the older children took care of the younger children most of the time. However, Catherine testified

3

that she had primary responsibility for all the kids. The older children also testified and mostly corroborated Edward's testimony. They said they did most of the household cleaning. When it came to cooking responsibilities, no one agreed.

Around the time he married Catherine, Edward quit his mechanic job and began pursuing EBN full time. The business grew over the next four years, although the record does not include tax returns or financial reports for 2005, 2006 or 2007. By 2008, EBN had over $770,000 in gross sales, although it still had a net loss of around $20,000. In 2008, EBN started to backslide because of the down economy. Then in 2010, Edward grappled with personal issues that affected the business. Those resolved in 2011 and did not recur.

Edward testified that Catherine never worked for EBN in any significant manner. She worked as a hairdresser. Her annual-reported income was steady at around $28,000 between 2005 and 2007. Her income started to drop in 2008. According to Edward, Catherine was losing clientele. In 2011, Catherine went to school to become a medical assistant. She graduated and has been working part-time at a chiropractor's office since then.

Edward asserted that Catherine's income remained above his own until around 2012. However, there was conflicting evidence on this assertion. For

some period of time, Edward comingled his personal and business funds. In 2010, Edward more formally started to take a shareholder distribution from the company. An accountant hired to value EBN found an average normalized officer compensation of around $45,000 between 2008 and 2011 and average actual distributions of around $23,000. From this, we can infer that Edward shouldered much of the financial burden for the family. Furthermore, Edward claimed that he was primarily responsible for paying the family's bills.

The couple separated in May 2012. By this time, the older children were adults. Edward moved out and Catherine remained at home with their two younger children. Both parties testified that they knew the separation was final. Eventually Edward and Catherine found other paramours and cohabitated with them.

A couple of months after the separation, Edward contacted an attorney who drafted a written separation agreement. Catherine said she read the agreement but did not move forward with it because she could not afford an attorney. The court credited Catherine and found that she did not accept the written agreement. Instead, as the court found, the parties entered an oral agreement for post-separation support. Catherine testified she received $1600 a month from Edward, but Edward claimed to pay slightly more. Once the

A-0700-17T3

children finished their schooling, Catherine and Edward agreed to sell the house and split the proceeds. They did not discuss EBN.

EBN flourished after the separation. Edward said that he was able to give more time to the business than before because Catherine was spending more time with the kids. EBN also expanded in two important ways. First, it acquired new product lines – EBN started to act as a distributor for a number of suppliers in the industry. Second, it acquired Ashford Manufacturing and was thus able to manufacture and sell some parts and components internally. Also, Edward said that the earlier economic slowdown had driven a number of his competitors out of business.

Nearly two-and-a-half years after the separation, Edward filed for divorce on September 2, 2015. Edward and Catherine both explained that the delay had to do with financial considerations.

Edward and Catherine jointly hired the accountant to value EBN. She assessed the business's fair market value at two points in time. She valued EBN at $183,000 in 2015 and, using a less involved methodology, valued it at between $43,000 and $56,000 in June 2012. She did not value the company as of 2004.

A-0700-17T3

The court equitably distributed half of the $183,000 value to Catherine, payable in sixty-one monthly installments. The only other significant marital asset, the marital home, was to be sold after E.F. graduated from school, and its proceeds equally divided. Based on Catherine's cohabitation, the court denied her alimony. The court ordered Edward to pay $203 in weekly child support for E.F., and declared A.F. emancipated.

## II.

Edward presents three issues are on appeal, all pertaining to the equitable distribution of EBN: (1) was EBN subject to equitable distribution; (2) if so, should it be valued as of the date of separation, or the date of the divorce filing; and (3) did the trial court err by awarding EBN's value equally between Edward and Catherine.

We review the trial court's fact findings with substantial deference, Cesare v. Cesare, 154 N.J. 394, 411-12 (1988), but review legal conclusions de novo, Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We apply an abuse-of-discretion standard in reviewing an equitable distribution. La Sala v. La Sala, 335 N.J. Super 1, 6 (App. Div. 2000). In other words, we will only overturn a distribution award if the trial court's decision "was not premised upon consideration of all relevant factors, was based upon consideration of

7

irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005).

A.

We first consider whether EBN was subject to equitable distribution. The trial court held that it was subject to equitable distribution because EBN was an active-immune asset, which increased in value during the marriage, partly due to Catherine's contributions. We agree.

Property acquired before marriage is generally immune from equitable distribution. Painter v. Painter, 65 N.J. 196, 214 (1974); N.J.S.A. 2A:34-23.[1] The party asserting immunity has the burden of proof. Pascale v. Pascale, 140 N.J. 583, 609 (1995); Painter, 65 N.J. at 214. However, once a party proves that an asset is generally immune, the non-owner spouse may overcome the "rebuttable presumption that any subsequent increase in value will also be immune." Sculler v. Sculler, 348 N.J. Super. 374, 381 (Ch. Div. 2001). Three elements must be shown:

> (1) there has been an increase in the value of the asset during the term of the marriage; (2) the asset was one which had the capacity to increase in value as a result of the parties' effort (an active immune asset); and (3)

---

[1] Pre-marital property may also lose its immunity if the owner commingles it with marital assets, with the intent to gift it to the marital enterprise. See, e.g., Ryan v. Ryan, 283 N.J. Super. 21, 25 (Ch. Div. 1993).

A-0700-17T3

the increase in value can be linked in some fashion to the efforts of the non-owner spouse.

[Ibid.]

The first element speaks for itself. We explain the other two.

Immune assets can be either passive or active. Valentino v. Valentino, 309 N.J. Super. 334, 338 (App. Div. 1998). Passive assets fluctuate in value solely due to external market conditions. Ibid. Active assets fluctuate in value due to the efforts of involved persons. Ibid.

The non-owner spouse can contribute to an asset's appreciation in a number of ways. For instance, a non-owner spouse can provide the necessary support that allows his or her partner to devote time and energy to a business. Id. at 339 (concluding that a spouse who "took care of the home, worked part-time and raised [their son]" contributed to an asset's appreciation).

The trial court did not err in finding that EBN was subject to equitable distribution. The asset increased in value during the marriage. While the increase was directly tied to Edward's efforts, Catherine indirectly contributed to the increase by enabling Edward to devote time and resources to EBN.

Edward argues that this is incorrect for two reasons. First, he claims that Catherine did not contribute to EBN because she did not perform the majority of the household duties during the marriage. This argument is inconsistent with

<u>Valentino</u>.  Catherine provided financial stability and flexibility so that Edward could pursue EBN, a risky business venture.  As the trial court found, based on adequate support in the record, "[I]t was his marriage to [Catherine], and her financial and non-financial contributions to the household and child rearing, that allowed plaintiff to devote his full-time efforts to building EBN."

Second, Edward argues that most of EBN's appreciation took place after the 2012 separation.  Consequently, he suggests Catherine did not contribute to EBN's growth.  However, the fact that the company grew significantly post-separation but pre-complaint is relevant to the ultimate allocation decision, not the question whether EBN was subject to distribution in the first place.  The Supreme Court has explained that the effects of a separation should enter the trial court's analysis when distributing the assets between the parties.  <u>Portner v. Portner</u>, 93 N.J. 215, 222-23 (1983); <u>Rothman v. Rothman</u>, 65 N.J. 219, 232 (1974) (distinguishing between a trial court's decision to identify, valuate, and equitably distribute an asset).

Separately, Edward argues that the trial court improperly subjected EBN's full $183,000 value at the end of the marriage to equitable distribution.  He correctly notes that only the value that appreciated during the marriage is subject to equitable distribution, and then, only if the appreciation is "derived, in part

or in whole, from the efforts of the non-owner." Valentino, 309 N.J. Super. at 338.

The trial court assumed that EBN had no value in 2004, at the start of marriage. At first glance, this assumption seems reasonable. Edward established EBN in 2001 but first decided to pursue it as a full-time business in 2004, a year for which EBN reported a net loss of $13,000. Edward argues that the trial court should not have made that assumption. We agree.

An unprofitable business may still have a positive fair market value.[2] For instance, a business can have valuable tangible assets or inventory, as well as intangible assets, such as goodwill and customer lists. Notably, EBN had sales of over $208,000 in 2004 and a gross profit, after deducting cost of goods, of over $38,000. EBN possessed inventory and two vehicles. Nevertheless, the record in this case does not establish what value, if any, EBN held in 2004. A remand is necessary to develop more information.

_____

[2] See Shannon P. Pratt et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies 53 (4th ed. 2000) ("[T]he value of a business or business interest is the sum of the expected future benefits to its owner . . . .") (emphasis added); David Lara, Shannon P. Pratt, Business Valuation and Federal Taxes: Procedure, Law, and Perspective Ch. 17 (2d ed. 2011) (describing an approach used to value companies that are "unprofitable for the foreseeable future").

We consider whether Edward or Catherine should have the burden of proof to establish EBN's value in 2004. Sculler explains that the non-owner spouse must show that "there has been an increase in value of the asset during the term of the marriage." 348 N.J. Super. at 381. Naturally, to establish an asset's appreciation, its value must be established at both the beginning and the end of the valuation period. Sculler can be read to suggest it was Catherine's burden to prove EBN's value in 2004.

We do not think such a rule makes sense in this case. General principles suggest that courts must consider the parties' "comparative interests" and "relative litigational strengths," their "access . . . to proof[s]," and the "objectives to be served by the evidence," when assigning the burden of proof. Romano v. Kimmelman, 96 N.J. 66, 89 (1984). Here, Edward contends EBN had value before marriage. In other words, he asserts part of the asset is immune from equitable distribution. Because the burden to establish an asset's immunity "rest[s] upon the spouse who asserts it," Painter, 65 N.J. at 214, we hold that Edward must prove that EBN had value in 2004. As it may have been unclear that he had that burden, it is fair to remand to give him an opportunity to present proof as to EBN's pre-marital value.

A-0700-17T3

B.

We next consider whether EBN should be subject to distribution using its value in 2015 or 2012.  We conclude that the trial court correctly used 2015 as the valuation date.

Property acquired after a marriage has ended is not subject to equitable distribution.  Thieme v. Aucoin-Thieme, 227 N.J. 269, 285 (2016) ("[T]he property to be divided is that which was earned, or otherwise acquired, during the period in which the parties acted in pursuit of the shared enterprise of a marriage or civil union.").  Equitable distribution of an asset is thus bounded by the end date of the marriage.

The Painter Court considered various dates that could constitute a marriage's end date for purposes of an asset's valuation.  65 N.J. at 217-18.  The Court rejected the divorce judgment date because it would create a burdensome bifurcated trial.  Ibid.  The Court then considered whether, on public policy grounds, the date of "irretrievable breakdown of the marriage" should be used.  Ibid.  The Court said it "would be unworkable" because it would be too difficult to establish with "any reasonable precision" when the marriage broke down.  Ibid.  The Court settled on a pragmatic solution: the day the divorce complaint was filed.  Ibid.

A-0700-17T3

Over time, the Court moved away from this bright-line rule in limited situations. The Court rebalanced Painter's pragmatic concerns, where possible, with public policy considerations. The Court recognized two exceptions to the Painter rule: first, where the couple physically separated and entered into a written separation agreement, the agreement date governs; second, where the couple separated and actually divided their assets pursuant to an oral agreement, "assets acquired afterwards are not eligible for equitable distribution." Portner, 93 N.J. at 220 (quoting Brandenburg v. Brandenburg, 83 N.J. 198, 208-09 (1980)). In such cases, the parties have physically separated and there was "an event that clearly indicated that both parties had agreed that marriage was completely and finally dissolved." Portner, 93 N.J. at 220.

This case does not satisfy either exception. Although Edward and Catherine physically separated, they only reached an oral agreement regarding financial support. Here, the parties never agreed about the disposition of EBN, never submitted a written agreement dividing assets, and never actually divided assets. The court correctly valued EBN using the date the divorce complaint was filed in 2015.

Edward argues that 2012 should be used because both parties testified that they believed the marriage was over in 2012. Quoting Portner, he asserts "an

14

event that marks the end of a marriage for the purpose of equitable distribution should reflect an unconditional intent to end the marriage." 93 N.J. at 221. Edward misunderstands <u>Portner</u>. Evidence of a marriage-ending event, such as infidelity, does not suffice. The Court fashioned a rule to avoid litigation over "the ever-elusive date when the marriage truly ended." <u>Id.</u> at 223. To depart from the divorce complaint's filing date, <u>Portner</u> requires a party to present reliable evidence in the form of a written agreement or the actual division of assets, which formally ended the shared pursuit of marriage.

C.

Edward argues that the trial court abused its discretion by dividing EBN equally between himself and Catherine. He claims that Catherine did not significantly contribute toward EBN or the household; he bore the risk of pursuing EBN, and he should receive just reward as the primary risk bearer.

The Legislature enumerated a non-exhaustive list of sixteen factors that a trial must consider when equitably distributing marital property. N.J.S.A. 2A:34-23.1. To apply the factors, a trial court "shall make specific findings of fact." <u>Ibid.</u> While a trial court may not "mechanistically" divide marital assets equally, <u>Gibbons v. Gibbons</u>, 174 N.J. Super. 107, 114 (App. Div. 1980), <u>rev'd on other grounds</u>, 86 N.J. 515 (1981), equal division may be appropriate, <u>see,</u>

15

e.g., Overbay v. Overbay, 376 N.J. Super. 99, 114 (App. Div. 2005). In this case, the trial court considered all sixteen factors and made specific findings of fact for all of them.

The trial court observed that Edward did not pursue EBN full-time until after he decided to marry Catherine. The court found that Edward was able to safely pursue EBN because of Catherine's financial and non-financial contributions. The record shows that Catherine contributed a significant portion, if not most, of the household income between 2004 and 2012. Catherine helped raise the kids and performed at least some household chores, such as the laundry. The trial court's findings were based on sufficient evidence in the record. Therefore, we shall not disturb them.

Edward's risk-based argument fails to respect the partnership nature of a marriage. While he was pursuing EBN, Catherine lacked the benefit of a spouse's regular income and stable employment. In other words, Catherine shared in the risk with Edward when he pursued EBN.

Most of EBN's appreciation occurred after the separation, but we find that the trial court properly considered this fact when it distributed EBN. While EBN grew for a number of reasons, Edward himself admitted that the separation gave him more time to work on EBN because Catherine assumed a greater share of

16

the household and child-rearing duties. We shall not disturb the trial court's finding that "[Catherine] made an equal, non-financial contribution to the appreciation in value of [EBN] even after the parties separated."

We remand to allow Edward the opportunity to prove EBN had positive pre-marital value. We otherwise affirm. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0700-17T3