**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3309-18[1]

J.T.S.,[2]

      Plaintiff-Respondent,

v.

S.R.,

      Defendant-Appellant.

_____

      Submitted May 19, 2021 – Decided August 19, 2021

      Before Judges Sumners and Mitterhoff.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-1195-15.

---

[1] The parties filed separate appeals of the judgement of divorce and a March 19, 2020 order; defendant on April 3, 2019, under A-3309-18, and plaintiff on April 10, 2019, under A-3385-19. After the appeals were consolidated, plaintiff failed to timely file a brief. His appeal was accordingly dismissed. Consequently, we consider only the issues raised by defendant.

[2] Pursuant to Rule 1:38-3(d)(3), we use initials to protect the confidentiality of the participants in these proceedings.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the brief).

Respondent has not filed a brief.

PER CURIAM

Defendant S.R. appeals from the Family Part's September 14, 2018 judgment of divorce and March 19, 2019 order denying, in large part, both parties' motions for reconsideration. She challenges the trial judge's rulings regarding parenting time, attorney's fees, child support, alimony, and equitable distribution.

On appeal, defendant raises the following issues for our consideration:

> POINT I
>
> THE FAMILY COURT ABUSED ITS DISCRETION IN ORDERING UNSUPERVISED PARENTING TIME FOR PLAINTIFF WHILE DISREGARDING THE SUBSTANTIAL EVIDENCE IN THE RECORD OF PLAINTIFF'S SUBSTANCE ABUSE ISSUES AND NOT ORDERING PLAINTIFF TO COMPLY WITH THE SUBSTANCE ABUSE EXPERT'S RECOMMENDATIONS.
>
> POINT II
>
> THE FAMILY COURT ABUSED ITS DISCRETION BY AWARDING ONLY A SMALL PORTION OF THE ATTORNEY[S'] FEES THAT DEFENDANT INCURRED IN THE DIVORCE LITIGATION.

2

POINT III

THE FAMILY COURT ABUSED ITS DISCRETION IN AWARDING ONLY $4,000 PER MONTH IN CHILD SUPPORT.

POINT IV

THE FAMILY COURT ERRED IN ORDERING THAT DEFENDANT WAS ENTITLED TO ALIMONY FOR ONLY [FORTY-TWO] MONTHS.

POINT V

THE FAMILY COURT ERRED IN CALCULATING THE AMOUNT OWED TO DEFENDANT IN PAST DUE SUPPORT.

POINT VI

THE FAMILY COURT ABUSED ITS DISCRETION IN AWARDING DEFENDANT ONLY [TWENTY] PERCENT OF THE MARITAL INCREASE IN VALUE OF . . . PLAINTIFF'S LAW FIRM.

POINT VII

THE FAMILY COURT ERRED IN ITS DETERMINATION REGARDING THE [MORRISTOWN] HOME.

POINT VIII

THE FAMILY COURT ERRED IN NOT CREDITING DEFENDANT WITH HALF OF THE MONEY THAT PLAINTIFF USED TO PAY DOWN PRE[]MARITAL DEBT OF HIS OWN, RATHER THAN TOWARD THE MARITAL OBLIGATIONS OF THE PARTIES.

3

POINT IX

THE FAMILY COURT ERRED IN ORDERING AN INSUFFICIENT AMOUNT OF LIFE INSURANCE COVERAGE.

We conclude there is no merit to any of these arguments and affirm the judgment of divorce and March 19, 2019 order in all respects.

I.

The parties were married on September 10, 2011. Plaintiff filed for divorce on April 2, 2015. Two children were born during the marriage. A trial was held over seven non-consecutive days. A judgment of divorce was entered on September 14, 2018. Thereafter, defendant moved for reconsideration requesting several amendments with regard to parenting time, attorney's fees, arrears, child support, alimony, and equitable distribution. Defendant also requested that the court enforce the payment schedule set forth in the judgment of divorce. Plaintiff cross-moved for reconsideration of the judge's decisions regarding parenting time, arrears, and two debts he was ordered to repay to defendant. On March 19, 2019, the judge denied both parties' requests to make substantive changes to the judgment of divorce but ordered plaintiff to comply with the payment schedule.

A-3309-18

As an attorney, plaintiff was the primary wage earner during the marriage. His average annual income from 2012 through 2015 was $452,541. Defendant has a sporadic employment history, having worked only part-time for most of her adult life. Before meeting plaintiff, she was a freelance makeup artist and sold cosmetics. She was last employed as a tarot card reader, working one day a week, but left that employment shortly after the parties were married. Defendant collects rental income from four properties; three of which she co-owns with her siblings and another which she owns by herself. For the purposes of equitable distribution and alimony, the trial judge found defendant's post-marital annual income was $30,000.

The parties met around June 2006 and began dating shortly thereafter. In April 2009, plaintiff purchased a home in Morristown where the parties resided during their marriage. Defendant gave up an apartment she shared with a roommate and moved into the house with plaintiff soon after it was purchased. At that time, unbeknownst to defendant, plaintiff was still married to his second wife. His second marriage was dissolved in March 2010. The parties were engaged to be married in September 2010.

In order to pay for the home, plaintiff contributed approximately $188,000 toward the down payment and closing costs, while defendant's parents provided

another $60,000. Plaintiff also spent approximately $50,000 in home improvements prior to the marriage. Title to the property was placed in plaintiff's name only.

At trial, plaintiff testified that the parties never intended for defendant to have any ownership interest in the home. He alleged that the $60,000 was an interest-free loan to him, not defendant, with no repayment schedule. Defendant disputed that the money was a loan to plaintiff, but rather a gift to her, from her parents, to assist in the purchase of her first marital home. She claimed that she agreed not be listed as an owner because plaintiff told her they would be unable to secure a mortgage if she was placed on the deed due to her poor credit. Defendant later testified, however, that when the home was purchased, she did not have poor credit. Although she understood that her credit rating was unlikely to prevent the parties from getting a mortgage, she agreed to the arrangement because plaintiff gave her and her father his word that she would be added to the deed later.

Defendant's father testified that he and his wife gave the money to their daughter to help purchase her first home and did not expect to be repaid. He believed the house would be placed in both parties' names, but testified that he

6

never spoke to plaintiff about how the property would be titled. The final judgment of divorce granted plaintiff sole ownership of the property.

Plaintiff entered the marriage with over $300,000 of tax debt. He claimed that he discussed his back taxes with defendant and that she entered the marriage fully aware of the situation. Defendant testified that she began acting as plaintiff's "personal accountant" in 2010. Because the parties opened a joint account before they were engaged, she had a granular understanding of plaintiff's finances. Defendant conceded that she knew plaintiff filed tax extensions each year prior to the marriage, but testified that she was unaware of the extent of the debt until the parties returned from their honeymoon, when they learned he was being audited for each year from 2005 to 2010. During the audits, defendant played a critical role in negotiating penalties, interest, and payment plans with the Internal Revenue Service (IRS). Both parties took out several lines of credit to service the tax debt.

In 2013, the IRS threatened to place a lien against the Morristown property unless plaintiff made a lump sum payment. The parties borrowed $85,000 from defendant's parents to pay the IRS. Defendant's father testified that he provided the loan only because the parties were in danger of losing their home, and that

A-3309-18

plaintiff promised to pay him back. Defendant claims plaintiff used $486,000 of marital income to pay premarital tax liabilities.

Defendant argued that both before and during the marriage, plaintiff abused drugs and alcohol. She testified that in 2008, plaintiff stopped going to work on a regular basis due to his substance abuse and began having problems with clients. Defendant convinced plaintiff to sell a bar that he owned in order to refocus on his legal career. In 2009, after defendant allegedly found plaintiff passed out in the bathroom, he attended a weekend seminar in an effort to get his substance abuse under control. Plaintiff temporarily reduced his drug use, but resumed shortly thereafter.

Defendant alleged that in 2010, the Trenton Bar Association investigated plaintiff's suspected substance abuse after he failed a drug test required for a life-insurance policy. She further alleged that in April or May of 2010, "two people that looked like cops from the criminal investigation bureau" came to the parties' home with a drug-sniffing dog and requested to search the house. She refused, but then found cocaine and paraphernalia hidden throughout the home. Defendant also testified that during the marriage, plaintiff consumed about six bottles of vodka each week.

8

M.K., defendant's former roommate, A.R., defendant's brother-in-law, and A.C., the parties' former housekeeper and babysitter, also testified with regard to plaintiff's purported substance abuse. M.K. alleged that plaintiff drank excessively from 2006 until he moved out after filing for divorce. Although she never saw plaintiff use any illicit substances, M.K. testified that she was with defendant in 2010 when investigators from the Trenton Bar Association came to the parties' home. When she helped defendant search the house, they discovered dozens of small plastics bags with white residue inside of them.[3]

A.R. testified that he observed plaintiff use cocaine on three occasions between 2006 and 2010. A.C. testified that during the marriage, she disposed of several empty bottles of vodka each week and occasionally found folded dollar bills with white residue in the laundry.

Defendant's concern about plaintiff's drug use prompted her to organize an intervention in January 2013. She testified that plaintiff abstained from drugs and alcohol for a few months after the intervention, but began using again the following St. Patrick's Day and continued through the end of their marriage.

---

[3] No other evidence of the alleged investigation was submitted at trial or on appeal.

After plaintiff filed for divorce, he continued to deposit his earnings into a joint account he shared with defendant. In July 2015, he ceased depositing all of his wages and began putting $15,000 per month into the account to support defendant and the children. He also continued to pay all schedule A (housing) and B (transportation) costs of both parties. In January 2016, he reduced the deposits to $8,400 per month, prompting defendant to file a motion requesting that the court order plaintiff to provide pendente lite support.

Attached to the motion was an affidavit in which defendant made allegations regarding plaintiff's purported drug abuse. To contest the affidavit, plaintiff had blood and urine tests performed the day after he received notice of the motion, and a hair-follicle test the following week. All of the samples tested negative for illicit substances.

On March 21, 2016, the parties executed a consent order which set forth plaintiff's pendente lite support obligation and a custody schedule. The order also directed the parties to retain certain experts. Plaintiff was required to cover all schedule A and B expenses for defendant and the children, which amounted to $11,000 per month, maintain all health, life, and auto insurance policies the parties had in place, and deposit an additional $12,000 per month into their joint account as unallocated pendente lite support. The parties agreed to maintain the

parenting-time status quo, which granted plaintiff supervised visitation with the children every other weekend from 10:00 a.m. on Saturday to 8:00 p.m. on Sunday, and every Monday and Wednesday from 5:00 p.m. to 8:00 p.m. Plaintiff's mother was required to be present for a majority of his parenting time, with overnights to occur at her house or plaintiff's sister's house.

Thomas Hoberman, CPA/ABV/CFF, was selected to perform a financial analysis of the marital cashflow, and to assess the value of plaintiff's interest in his law firm from the date of the marriage to the date he filed for divorce. The parties also chose Gregg Benson, MA, to perform an evaluation of plaintiff's alleged drug and alcohol abuse. The consent order indicated that the custody schedule, including the supervised parenting-time requirement, would be revisited upon submission of Benson's report. Both parties were directed to promptly provide all of the documents and information requested by the experts, and to fully cooperate in the evaluations.

In assessing the value of plaintiff's law firm, Hoberman utilized a capitalized earnings calculation to valuate cash flow specific to plaintiff and each of his two partners, rather than using the firm's cash flow as a whole and taking plaintiff's interest. Based on the revenues generated by each partner, he concluded that the value of plaintiff's interest in the firm increased by $167,000

11

during the marriage. He noted that the largest contributing factor to the increase was the revenue generated by another partner. From 2011 through 2014, plaintiff billed approximately $1,700,000 in fees. During the same period, his partner billed approximately $5,660,000 in fees.

During Benson's evaluation, plaintiff had hair, nail, urine, and blood tests performed on May 6, 2016 and July 12, 2016. He was instructed to undergo testing within twenty-four hours on both occasions. Prior to trial, the judge also directed plaintiff to get another panel of tests performed on a surprise basis. All tests were negative. Benson's actual assessment of plaintiff consisted of two interviews, totaling two hours and forty-five minutes, and two sessions during which plaintiff completed a series of multiple-choice questionnaires. Benson also interviewed defendant during the evaluation for a total of six hours. Benson issued his report in June 2017, more than eleven months after the assessment was completed. When it was finally submitted, it contained portions of another patient's report.

Benson concluded that plaintiff's alleged substance abuse did not meet the clinical criteria for drug or alcohol use disorder, but made certain recommendations which defendant incorporated into a proposed parenting plan. The plan gave plaintiff supervised custody of the children every other weekend,

from 6:00 p.m. on Friday to 6:00 p.m. on Sunday, and alternating Mondays and Wednesdays, from 5:00 p.m. to 8:00 p.m.[4] It also required plaintiff to use Soberlink, at his expense, for a period of one year, with testing to occur twenty-four hours before pick-up, one hour after drop-off, and at 8:00 a.m., 1:00 p.m., and 10:00 p.m. during his parenting time.[5] Plaintiff agreed to use Soberlink for a period of three months, but refused to comply with the one-year recommendation.

In October 2017, plaintiff began reducing the amount of pendente lite support he deposited each month, or foregoing deposits entirely. Defendant received $8,038 of the $12,000 due in October 2017, $3,038 in November 2017, $3,000 in December 2017, $1,500 in January 2018, and nothing in February or March 2018. Plaintiff testified that he could no longer afford to pay $12,000 per month because he earned approximately $150,000 less in 2017 than 2016 and had substantial tax obligations. By the time of trial, plaintiff's arrears had increased to more than $60,000.

---

[4]   The record is unclear when, but at some point during the trial, plaintiff was permitted to begin exercising unsupervised parenting time.

[5]   Soberlink is a wireless alcohol monitoring system which includes a breathalyzer, facial recognition capabilities, tamper detection, and real-time reporting to designated monitoring parties. SOBERLINK, https://www.soberlink.com/faqs (last visited July 7, 2021).

A-3309-18

When formulating the parenting time schedule, the trial judge considered all of the evidence regarding plaintiff's alleged substance abuse. He found A.C. was only minimally credible, noting that her testimony seemed rehearsed and mechanistic. Although the judge determined that M.K. and A.R. provided reliable testimony, he found that they spoke only about events that occurred prior to the 2013 intervention, and that no witnesses provided convincing testimony of events that occurred after the intervention. The judge rejected defendant's contention that the children would be in danger if plaintiff were granted unsupervised parenting time, noting that, at that point in trial, plaintiff's time with the children had not been supervised for several months.

The judge discredited Benson's report, finding it "provided little of substance for [the] [c]ourt to review and rely upon." He admonished Benson for using a template report and for interviewing defendant for more than twice as long as the party actually being evaluated. The judge noted that Benson clearly failed to consider that the parties were involved in an extremely contentious divorce and described his approach as one of the most absurd things he's seen in his life. He cited plaintiff's negative drug tests, and indicated that in addition to the tests plaintiff took on his volition, and those required by Benson, the judge had also required an additional panel of tests on a surprise basis. The final

14

judgment of divorce granted plaintiff unsupervised parenting time every other weekend from Friday at 6:00 p.m. to Sunday at 6:00 p.m., each Monday from 5:00 p.m. to 8:00 p.m., and every other Wednesday from 5:00 p.m. to 8:00 p.m. As a condition of his parenting time, plaintiff was required to utilize Soberlink for a period of three months when picking the children up and dropping them off.

## II.

We begin with the well-established principle that our review of a Family-Part judge's fact finding is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We will not disturb any finding that is "supported by adequate, substantial, credible evidence." Fattore v. Fattore, 458 N.J. Super. 75, 83 (App. Div. 2019) (quoting Cesare, 154 N.J. at 411-12). Deference is especially appropriate here, because the evidence in a bench trial is "largely testimonial and involves questions of credibility." Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). A trial judge who observes witnesses and listens to their testimony is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). The legal conclusions drawn by a trial judge, however, are always subject to our de novo

15

review. Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013) (citing Dep't of Envtl. Prot. v. Kafil, 395 N.J. Super. 597, 601 (App. Div. 2007)).

A trial judge's decision to grant or deny a motion for reconsideration is also reviewed for an abuse of discretion. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (citing Kornbleuth v. Westover, 241 N.J. 289, 301 (2020)). Reconsideration is appropriate only if "1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990). We do not disturb a trial judge's decision unless it "is made without rational explanation, inexplicably departed from established policies, or rests on an impermissible basis." Kornbleuth, 241 N.J. at 302 (quoting Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super 378, 382 (App. Div. 2015)).

We first address the trial judge's ruling regarding parenting time. Defendant argues it was an abuse of discretion to implement a parenting plan that did not fully adopt the recommendations set forth in Benson's report. She contends that ample testimony elicited from multiple witnesses conclusively established plaintiff's ongoing drug and alcohol abuse. By permitting plaintiff

16

to exercise unsupervised parenting time, defendant argues the trial judge has placed the health and safety of the parties' daughters in jeopardy. Further, she criticizes the judge for failing to apply the statutory custody factors to the facts of the case as required by N.J.S.A. 9:2-4, in the final judgment of divorce or supplemental statement of reasons.

Contrary to defendant's contention, the trial judge properly exercised his discretion in evaluating the methodology and reliability of Benson's report. This was in accord with the judge's right "to accept or reject the testimony of either side's expert, and [to] not adopt the opinion" of a report he reasonably found was unreliable. Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002) (citing Carey v. Lovett, 132 N.J. 44, 64 (1993)).

Based on the credible evidence, the judge found that no witnesses provided convincing testimony regarding plaintiff's drug use after the 2013 intervention. To the extent that he had abused drugs at one point in his life, the evidence demonstrated that he had remained abstinent for at least five years preceding the trial. The drugs tests, which were administered on a surprise basis, and over a period of six months, were all negative. To accommodate defendant's concerns, plaintiff was ordered to use Soberlink when picking the kids up and dropping them off. Based on the circumstances that were presented to the trial

judge, we discern no abuse of discretion in rejecting Benson's recommendations or permitting plaintiff to exercise unsupervised parenting time. Further, although the judge did not reference the custody factors under N.J.S.A. 9:2-4 in his oral opinion, he conducted a sound application of each of the factors at the outset of the hearing on the parties' motions to reconsider. Consequently, we see no reason to disturb the trial judge's determination as to the parenting schedule.

## III.

Defendant next argues the trial judge abused his discretion by ordering plaintiff to pay only $95,000 of her counsel fees. She contends that plaintiff's failure to timely pay pendente lite support, his refusal to comply with Benson's recommendations, and the stonewalling tactics he employed with regard to financial discovery reasonably caused her to accrue over $280,000 in attorney's fees.[6] Defendant testified that sixty to seventy-five percent of her fees were due to plaintiff's bad-faith conduct prior to and during trial. In light of the vast income disparity between the parties, and plaintiff's conduct, defendant argues plaintiff should be ordered to pay the entirety of her fees.

---

[6] Plaintiff accrued approximately $80,000 in legal fees during the divorce.

An award of counsel fees in matrimonial matters is discretionary. Williams v. Williams, 59 N.J. 229, 233 (1971). A trial court abuses its discretion only "if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Rule 4:42-9(a)(1) permits the trial court to award counsel fees in a family action pursuant to Rule 5:3-5(c). Rule 5:3-5(c), in turn, lists the following factors a trial court must consider when deciding whether to award counsel fees:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

In this case, the trial judge considered each of the requisite factors under Rule 5:3-5(c), then ordered plaintiff to pay $95,000 of defendant's fees. The judge found plaintiff's decision to unilaterally reduce pendente lite support

19

payments was unreasonable and premised a portion of the fees awarded on his failure to make timely payments. He explained that the award was due in two parts to income disparity and one part plaintiff's conduct.

The judge rejected defendant's contention that the majority of her fees were caused by plaintiff's bad faith positions. He found plaintiff reasonably refused to comply with Benson's recommendation because the report and its conclusions were not reliable. The judge also found that there was insufficient evidence to conclude that plaintiff attempted to delay or obscure Dr. Hoberman's financial report. He noted that defense counsel did not question Hoberman at all about plaintiff's alleged failure to comply with discovery requests. The judge found that both parties advanced positions that were unreasonable during litigation, and that there appeared to be minimal efforts, on both sides, to resolve any dispute that arose amicably, before resorting to letters to the court and motion practice. Finally, the judge noted in his decision that he parsed through defense counsel's invoices, with counsel's assistance, to ascertain which fees were attributable to enforcement actions necessitated by plaintiff's bad-faith conduct.

Contrary to defendant's claims on appeal, the trial judge's decision was based on his consideration of the factors listed in Rule 5:3-5(c) and is consistent

20

with the evidence submitted by both parties. Consequently, we discern no abuse of discretion and defer to the trial court's sound reasoning and superior familiarity with the matter.

IV.

Defendant also challenges the trial judge's decisions regarding child support, the amount of life insurance plaintiff was ordered to maintain, and the duration of her spousal support. We note that trial courts are afforded substantial discretion in making both child support, Foust v. Glaser, 340 N.J. Super. 312, 315 (App. Div. 2001), and spousal support awards. Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 1999). "If consistent with the law, such an award 'will not be disturbed unless it is "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice."'" Foust, 340 N.J. Super. at 315-16 (quoting Raynor v. Raynor, 319 N.J. Super. 591, 605 (App. Div. 1999)).

A. Child Support

When calculating a child support award, courts must consider:

> (1) Needs of the child;
>
> (2) Standard of living and economic circumstances of each parent;
>
> (3) All sources of income and assets of each parent;

21

(4) Earning ability of each parent, including educational background, training, employment skills, work experience, custodial responsibility for children including the cost of providing child care and the length of time and cost of each parent to obtain training or experience for appropriate employment;

(5) Need and capacity of the child for education, including higher education;

(6) Age and health of the child and each parent;

(7) Income, assets and earning ability of the child;

(8) Responsibility of the parents for the court-ordered support of others;

(9) Reasonable debts and liabilities of each child and parent; and

(10) Any other factors the court may deem relevant.

[N.J.S.A. 2A:34-23(a).]

The final judgment of divorce required plaintiff to pay $4,000 per month in child support, cover the entire cost of the kids' private preschool tuition and health insurance, and pay for any unreimbursed medical expenses beyond $250. Defendant argues the award is insufficient to enable the children to maintain the lifestyle they enjoyed during the marriage.

The trial court applied and analyzed each of the required factors and determined $4,000 per month was sufficient to enable the children to continue

22

to enjoy the high standard of living that existed during the marriage. Defendant fails to identify which activities or expenses are not covered by the award. At trial, most of defendant's testimony pertaining to expenses during the marriage related to her own activities, not the children's. The judge found defendant's accounting of her monthly expenses, which she included in her Case Information Sheet (CIS), was unreliable. The CIS included expenditures such as $1,657 per month for lessons, $2,000 per month for restaurants, and $2,000 per month for clothes. The child support obligation in this case resulted from the trial judge's application of the factors listed in N.J.S.A. 2A:34-23(a), and is reasonably calculated to support the lifestyle that was established by the credible evidence at trial. Defendant has not presented any evidence the judge failed to consider and has not articulated any reason the support award is insufficient. Accordingly, we discern no abuse of discretion.

B. Life Insurance

Plaintiff was ordered to secure his child support obligation with two $150,000 life insurance policies, naming defendant as trustee of the proceeds. Defendant argues the trial court erred by failing to require plaintiff to maintain at least $1,000,000 in coverage to insure his entire child support obligation, the children's college expenses, and an appropriate cost of living increase.

When the circumstances equitably require, a court may order an obligor to secure his or her child support obligation with life insurance, naming the children as beneficiaries. Grotsky v. Grotsky, 58 N.J. 354, 361 (1971). Unlike alimony, however, outstanding child support obligations may be asserted against a deceased parent's estate. Kiken v. Kiken, 149 N.J. 441, 452-53 (1997). In addition to the life insurance policies required by the March 18, 2019 order, plaintiff's child support obligation is also secured by his real estate holdings. An April 2016 appraisal estimated plaintiff's Morristown home to be worth approximately $1,000,000. He also owns another residential property in Morris Plains. Because plaintiff owns substantial assets that may be used to financially support his children in the event of his untimely death, we discern no abuse of discretion in the judge's decision requiring plaintiff to maintain only $300,000 in coverage.

C. Duration of Alimony

With regard to the alimony award, defendant argues that the life of the marriage was not the proper polestar in this case to set the duration of spousal support. She contends that the judge erred in failing to adequately consider the amount of time the parties were in a committed relationship prior to their marriage, as well as her contribution to plaintiff's professional success.

24

When reviewing spousal support determinations, this court gives "deference to a trial judge's findings as to issues of alimony, if those findings are supported by substantial credible evidence in the record as a whole." Reid v. Reid, 310 N.J. Super. 12, 22 (App. Div. 1998). Limited duration alimony, at issue here, is expressly permitted by N.J.S.A. 2A:34-23(c), which provides:

> For any marriage . . . less than [twenty] years in duration, the total duration of alimony shall not, except in exceptional circumstances, exceed the length of the marriage . . . Determination of the length and amount of alimony shall be made by the court pursuant to consideration of all of the statutory factors set forth in [N.J.S.A. 2A:34-23(b)].
>
> [(emphasis added).]

Exceptional circumstances that may warrant an extension of the duration of alimony include:

> (1) The ages of the parties at the time of the marriage or civil union and at the time of the alimony award;
>
> (2) The degree and duration of the dependency of one party on the other party during the marriage or civil union;
>
> (3) Whether a spouse or partner has a chronic illness or unusual health circumstance;
>
> (4) Whether a spouse or partner has given up a career or a career opportunity or otherwise supported the career of the other spouse or partner;

(5) Whether a spouse or partner has received a disproportionate share of equitable distribution;

(6) The impact of the marriage or civil union on either party's ability to become self-supporting, including but not limited to either party's responsibility as primary caretaker of a child;

(7) Tax considerations of either party;

(8) Any other factors or circumstances that the court deems equitable, relevant and material.

[N.J.S.A. 2A:34-23(c).]

In this case, the evidence clearly demonstrates that throughout the marriage defendant relied on plaintiff for financial support. N.J.S.A. 2A:34-23(c)(2). The degree to which she was financially dependent, however, is mitigated by the short life of the marriage. No evidence was presented to suggest that defendant will be unable to reenter the work force. A three-and-a-half-year period of economic dependency does not present exceptional circumstances warranting alimony for a duration which exceeds the life of the marriage.

Similarly, acknowledging defendant's support of plaintiff's career, N.J.S.A. 2A:34-23(c)(4), and her responsibility as the primary caretaker, N.J.S.A. 2A:34-23(c)(6), neither justifies an extension of the duration of alimony payments. Her contribution to plaintiff's career was considered by the

26

trial judge and was the basis of his decision to award defendant a percentage of the value that plaintiff's law firm realized during the marriage. Notwithstanding defendant's role as the primary caretaker, she stopped working on a regular basis before the parties were married. Based on defendant's testimony, we cannot reasonably conclude that the marriage had any significant impact on her ability to become self-supporting. The duration of alimony in this case is supported by substantial credible evidence and therefore does not represent an abuse of the trial judge's discretion. Reid, 310 N.J. Super. at 22.

V.

The final judgment of divorce required the parties "to calculate the current support arrears pursuant to the terms of the March 21, 2016 Consent Order (as of September 30, 2018), and that amount (estimated by the [c]ourt at this time to be approximately $100,000), shall be paid to the [d]efendant in $10,000 monthly installments." Based on the parties' submissions, the judge determined plaintiff had failed to pay twenty-seven percent or $94,174 of defendant's schedule C expenses, and an additional $1,393.78 of her schedule A and B expenses. On reconsideration, defendant requested that the arrears be fixed at $137,919.72. The judge denied the request, without prejudice, and ordered the parties to engage in mediation for a period of at least four hours if they were

27

unable to agree on the gross amount owed. If mediation was unsuccessful, the parties were permitted to file a post-judgment application regarding the disputed amount or agree on an accountant to review the payments and issue a report on the total due.

On appeal, defendant argues the judge's calculation is not supported by credible evidence. Only final judgments, however, are appealable as of right to the appellate division. R. 2:2-3(a)(1). "Generally, an order is considered final [only] if it disposes of all the issues as to all the parties." Silviera-Francisco v. Bd. Of Educ. of Elizabeth, 224 N.J. 126, 136 (2016). Orders that decide only some intervening matter, and require further steps to enable a trial court to decide the issue on the merits are, by definition, interlocutory, and therefore may not be appealed as of right. Moon v. Warren Haven Nursing Home, 182 N.J. 507, 512 (2005) (quoting Black's Law Dictionary 815 (6th ed. 1990)). The portion of the March 19, 2020 order pertaining to arrears is interlocutory because it required further action by the parties meant to enable the trial judge to decide the issue on the merits. Only after defendant has complied with the order and obtained a final judgment regarding the outstanding arrears may she appeal that decision without leave of the court. Consequently, we decline to review the trial judge's arrears determination.

Next, defendant challenges the way the trial judge equitably distributed the Morristown property, the marital income used to pay plaintiff's tax debt, and plaintiff's interest in his law firm.

A.  The Morristown Property

In distributing the marital assets, the judge determined that the Morristown property was not purchased in anticipation of marriage and therefore was not subject to equitable distribution.  Because defendant was not awarded an interest in the home, the final judgment of divorce required plaintiff to repay the $60,000 defendant and her parents contributed to the down payment, and an additional amount equal to twenty percent of the value the property has realized from the date of purchase to the date the complaint for divorce was filed.  Defendant argues the judge abused his discretion by failing to award her one-half of the property's value because the home was purchased in anticipation of marriage.

Plaintiff acquired the Morristown property approximately sixteen months before the parties were engaged, and more than twenty-eight months before they were married.  Based the testimony of both parties, the trial judge reasonably found that the home was not purchased in anticipation of marriage.  That

conclusion is bolstered by the evidence showing plaintiff was still married to his second wife when he bought the house, and title to the property was placed in his name only. Defendant's explanation as to why she was not listed on the deed defies logic. On the one hand, she testified that she agreed not to be named on the title because her credit rating may have prevented the parties from obtaining a mortgage, but on the other, she testified that she understood she had good credit when the home was purchased. Moreover, as noted by the trial judge, defendant's credit rating may have been a valid consideration in applying for a mortgage, but would not prevent her from being named on the deed. If it was truly the parties' intent to share the property equally, plaintiff could have obtained a mortgage as the sole borrower, while still listing defendant on the title. Defendant's father's testimony further served to cut against defendant's credibility regarding the Morristown property. Defendant claimed that plaintiff promised her father he would grant her an interest in the home after it was purchased. Her father, however, that he never spoke to plaintiff about how the property would be titled. As the evidence clearly suggests the house was not purchased in anticipation of marriage, we discern no abuse of discretion in the judge's allocation of the Morristown property.

A-3309-18

B. <u>Tax Debt</u>

Defendant next argues the trial court erred by failing to order that she be reimbursed for the marital funds used to pay plaintiff's tax debt. Plaintiff used marital income to extinguish debt that pre-dated the parties' marriage, therefore, defendant contends plaintiff should be ordered to pay her for every dollar of marital income that went toward his pre-marital tax obligations. The trial judge found that although she may not have known the full amount, defendant entered the marriage entirely aware of the issues related to plaintiff's back taxes and that she willingly agreed to use marital income to pay down those debts. We agree.

When allocating marital assets, courts must consider, among other things, "[t]he contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount or value of the marital property. . . ." N.J.S.A. 2A:34-23.1(i). Although the Legislature has not defined "dissipation" of marital property, we have described the concept as a "plastic one, suited to fit the demands of the individual case." <u>Kothari v. Kothari</u>, 255 N.J. Super. 500, 506 (App. Div. 1992). "Dissipation may be found where a spouse uses marital property for his or her own benefit and for a purpose unrelated to the marriage at a time when the marriage relationship was in serious jeopardy." <u>Ibid.</u> (quoting <u>Head v. Head</u>, 523 N.E. 2d 17, 20-21 (Ill. App. Ct. 1988)).

To determine whether a spouse has dissipated assets, courts consider various factors, including:

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefitted the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and amount of, the expenditure.
>
> [Id. at 507 (quoting Lee R. Russ, Annotation, Spouse's Dissipation Of Marital Assets Prior To The Divorce As A Factor In Divorce Court's Determination Of Property Division, 41 A.L.R. 4th 416 (1985)).]

The party alleging dissipation bears the burden of proof on the issue. Monte v. Monte, 212 N.J. Super. 557, 567-68 (App. Div. 1986).

Here, defendant testified that the parties had shared a joint account since 2010, she acted as plaintiff's personal accountant before and during the marriage, and that she was aware plaintiff filed tax extensions each year. Her testimony established that she had a detailed understanding of plaintiff's finances before she entered the marriage. While she may not have known the precise amount plaintiff owed in unpaid taxes, her contention that she was entirely ignorant to his tax liabilities until after the parties were married is belied by her own testimony. As noted by the trial judge, paying the tax debt enabled the parties to keep the house and allowed defendant to enjoy a comfortable

lifestyle that plaintiff would likely not have been able to provide had the IRS seized the Morristown property. That conclusion is supported by defendant's father's testimony, in that he explained the reason he provided the loan was to enable plaintiff to keep the home where his daughter resided. Defendant also indicated that she obtained several lines of credit during the marriage to service the debt, thus illustrating her willingness to not only use marital funds to make payments, but also to assume a portion of the debt as her own as a function of the marital enterprise. Defendant has not presented anything in the record that persuades us she did not consent to the use of marital income to pay plaintiff's tax debts or that the payments were not mutually beneficial. Consequently, we see no reason to disturb the trial judge's decision.

C. The Law Firm

The final judgment of divorce granted defendant "an amount equal to [twenty percent] of the increase in value of [plaintiff's] interest in his law firm from the date of marriage through the date of [the] [c]omplaint." Defendant argues the trial judge erred in failing to award half of the marital increase in value of plaintiff's interest in his law firm. She suggests that her contribution to plaintiff's professional success entitles her to a greater share of his interest.

"Any property owned by a husband or wife at the time of marriage will remain the separate property of such spouse and in the event of divorce will be considered an immune asset and not eligible for distribution." Valentino v. Valentino, 309 N.J. Super. 334, 338 (App. Div. 1998) (citing Painter v. Painter, 65 N.J. 196, 214 (1974)). Under some circumstances, however, the appreciation of preowned assets during the marriage will be subject to distribution depending on whether it is passive or active. Ibid. A passive asset fluctuates in value based exclusively on market conditions, while an active asset "involves contributions and efforts by one or both spouses toward the asset's growth and development which directly increase its value." Ibid. (citing Scavone v. Scavone, 230 N.J. Super. 482, 486-87 (Ch. Div. 1988)). When the increase derives from the efforts of the non-owner, the appreciation is subject to distribution. Ibid.

Plaintiff started his firm with another person in 2007, and added a third equity partner in 2008. The business is therefore a premarital asset exempt from equitable distribution. See id. at 338 (citing Painter, 65 N.J. at 214). Despite the firm's exempt status, defendant has an interest in the portion of the value of the firm that is attributable to the efforts of either spouse during the marriage. Ibid. Hoberman's report concluded that plaintiff's interest increased by $167,000 from the date of marriage to the date the complaint for divorce was

filed. Based on the length of the marriage and the revenues generated by each partner, the trial judge awarded defendant twenty percent of the increased value.

There is ample evidence to support the trial judge's findings with respect to the parties roles' in the success of the law firm. As noted by Hoberman, plaintiff's partner generated more than three times the revenue that plaintiff did during the marriage. Consequently, only a small portion of the appreciated value is reasonably attributable to the parties' marital efforts. While crediting defendant for her role in plaintiff's professional success, the evidence adduced at trial sufficiently supports the judge's distribution of the firm's appreciated value.

We conclude the trial judge did not abuse his discretion in any respect with regard to the April 14, 2018 judgment of divorce or the March 19, 2019 order denying defendant's request for reconsideration.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

35

A-3309-18